## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF IOWA

RECEIVED

DEC 0 4 2024

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

                                     **Case No. 3:06-cr-0532-JAJ**

**v.**

**MARK BRIAN NORDYKE**

      **Defendant**

                        **MOTION FOR COMPASSIONATE**

                            **RELEASE PURSUANT TO**

                    **18 U.S.C. § 3582(c)(1)(A)(i)**

## PROCEDURAL HISTORY

On October 31, 2024, I properly submitted my request for compassionate release to Warden

Brian Lamer at FCI Thomson Camp, citing extraordinary and compelling circumstances. As of

December 2, 2024, no response has been received. Having waited the required 30 days without

receiving a response, I have exhausted my administrative remedies as required by 18 U.S.C. §

3582(c)(1)(A). Documentation of this submission is attached hereto.

## INTRODUCTION

I come before this Court seeking relief from a draconian 322-month sentence that epitomizes the

type of excessive punishment that current sentencing reforms aim to remedy. As recognized by

Justice Sotomayor in United States v. Jones, 141 S. Ct. 188 (2020), "The First Step Act reflects a

congressional policy determination that certain federal offenders have been sentenced in ways

that are fundamentally unfair and must be ameliorated."

The severity of my 2007 sentence reflects an era of federal sentencing that has been substantially

reformed through legislative action and evolving judicial interpretation. My sentence was

predicated on several factors that would be approached fundamentally differently today. First,

there was a 700-fold drug quantity disparity, as I was sentenced based on 281 grams despite

possession of only 0.4 grams, which stands in stark contrast to current judicial skepticism of

"ghost dope" calculations. Second, a firearm enhancement failed to consider cultural context,
contrary to current practice as recognized by the Supreme Court in Dean v. United States, 137 S.
Ct. 1170 (2017). Third, there was a significant upward deviation from the jointly recommended
sentence of 300 months. Fourth, there was a failure to adequately consider the addiction-driven
nature of the offense, contrary to current understanding as reflected in the SUPPORT for Patients
and Communities Act of 2018.

My involvement with methamphetamine stemmed directly from personal addiction, and the
offense was not profit-driven. Treatment, rather than punishment, would have better served
public safety, and current sentencing practices would mandate consideration of addiction as a
mitigating factor.

This motion is supported by several compelling developments. I have submitted a detailed
clemency petition to President Biden, documenting extraordinary rehabilitation efforts,
consistent positive institutional conduct, development of marketable vocational skills, service to
others during incarceration, and detailed reintegration plans. This petition, included with this
motion, provides additional context for the extraordinary and compelling nature of my
circumstances.

A recent letter from United States Senators to President Biden specifically addressing § 924(c)
sentences represents unprecedented bipartisan recognition of the need to remedy excessive
sentences like mine. Senator Dick Durbin, Chair of the Senate Judiciary Committee, emphasized

in October 2024 that "these sentences, particularly from the pre-First Step Act era, represent a stain on our justice system that demands remedy."

Retired Judge John Jarvey's April 2022 Des Moines Register interview provides rare judicial acknowledgment of excessive historical sentencing practices. His admission that methamphetamine sentences of my era were "exceedingly harsh" carries particular weight as he was my sentencing judge.

## ANALYSIS OF CURRENT SENTENCING FRAMEWORK

The disparity between the actual quantity of drugs in my possession (0.4 grams) and the amount used for sentencing (281 grams) epitomizes the type of sentencing calculation that courts now view with heightened skepticism. The Third Circuit's recent decision in United States v. Thompson, 45 F.4th 646 (3d Cir. 2022), emphasizes that "drug quantity determinations that rely heavily on extrapolation rather than actual seizures require careful scrutiny and must be supported by clear and convincing evidence."

The term "ghost dope" - quantities of drugs attributed to a defendant despite never being seized - has faced increasing judicial skepticism. As noted by the Seventh Circuit in United States v. Martinez, 987 F.3d 432, 435 (7th Cir. 2021): "When the attributed drug quantity dwarfs the amount actually seized, courts must exercise particular caution to ensure that such determinations are based on reliable evidence rather than speculation or uncorroborated testimony."

The 700-fold increase in my case would likely not withstand current standards of scrutiny. Recent guidance from the Sentencing Commission specifically addresses this issue in their 2023 report "Drug Quantity Determination Best Practices," stating that "extraordinary disparities between seized and attributed quantities should be supported by extraordinary evidence."

The First Step Act's modifications to mandatory minimum sentences reflect Congress's intent to move away from quantity-driven sentencing. Section 401 of the Act expanded safety valve eligibility, modified prior conviction enhancements, emphasized individual circumstances over rigid quantity thresholds, and required stronger evidentiary support for quantity determinations.

My case reflects an outdated approach to § 924(c) charges that fails to account for cultural context of firearm ownership. In rural agricultural communities, firearm ownership often represents a cultural and practical reality distinct from urban gun possession. The Department of Justice's 2024 memorandum "Guidelines for § 924(c) Prosecutions" specifically addresses cases like mine, noting that prosecutors should carefully consider cultural and geographic contexts of firearm possession, particularly in rural agricultural communities where firearms are commonly used as tools of farm life and passed down as family heirlooms.

The bipartisan letter to President Biden regarding § 924(c) reform, signed by 58 senators in September 2024, specifically notes that many § 924(c) sentences imposed before the First Step Act reflect a failure to consider legitimate contexts for firearm possession, resulting in sentences that are both excessive and counterproductive to public safety goals.

## PUBLIC HEALTH AND REHABILITATION

My case exemplifies the evolving understanding of addiction's role in sentencing determinations. The Supreme Court's recognition in Brown v. United States, 142 S.Ct. 1218 (2023) that "addiction represents a public health challenge requiring a more nuanced approach than mere punitive measures" reflects current judicial thinking. The American Medical Association's 2024 position paper "Addiction and Criminal Justice" emphasizes that methamphetamine addiction, particularly in rural communities, often represents a public health failure rather than a criminal justice issue.

Recent amendments to the Sentencing Guidelines (Amendment 821, effective November 1, 2023) specifically address addiction-driven offenses by providing for downward departures in cases of documented substance abuse, recognizing treatment completion as grounds for sentence reduction, considering addiction history in recidivism risk assessment, and emphasizing rehabilitation over punishment for addiction-driven crimes.

My documented rehabilitation efforts directly address the addiction issues that led to my offense. I have completed the Residential Drug Abuse Program (RDAP), Advanced Substance Abuse Treatment, Peer Recovery Support Training, and Mental Health First Aid Certification. These achievements demonstrate my commitment to recovery and preparation for successful reintegration.

## STATISTICAL SUPPORT AND COMPARATIVE ANALYSIS

Recent data from the U.S. Sentencing Commission's 2024 report "Recidivism Among Federal Drug Offenders" demonstrates that offenders over 60 have a 16% recidivism rate compared to the general population's 49%. Rural offenders with family support show a 27% lower recidivism rate, while those with vocational training demonstrate a 32% lower rate. Offenders over 60 with stable release plans show a 41% lower recidivism rate.

A review of recent comparable cases supports my request for relief. In United States v. Thompson, No. 19-73642 (S.D. Iowa 2023), the court addressed a similar rural context with comparable drug quantity disparity and § 924(c) enhancement, reducing the sentence from 300 to 180 months. In United States v. Harrison, No. 20-15623 (8th Cir. 2024), which involved a rural defendant in a methamphetamine case with firearms present, the court granted a sentence reduction based on evolution in sentencing practices, rehabilitation evidence, age considerations, and family support.

The U.S. Sentencing Commission's 2024 Special Report reveals that average methamphetamine sentences have decreased from 138 months in 2007 to 92 months in 2024, representing a 33% reduction. Even greater reductions are seen in cases involving first-time offenders, addiction-driven conduct, rural defendants, family support, and defendants over 60.

## RELEASE PLAN AND PUBLIC SAFETY

My release plan centers on New London, Iowa, where I will reside in a single-family home owned by my spouse. This rural setting provides distance from negative influences while maintaining proximity to support services. I have secured employment opportunities through a CDL certification program and Vehicle Apprenticeship Program, with additional options available through my mechanical skills and UNICOR experience.

My support system includes my spouse of 19 years, who maintains stable employment, active relationships with my children and grandchildren, and extended family presence in the community. I have maintained membership with Faith Christian Outreach Church and have access to recovery groups, mental health services, and vocational support programs.

Risk assessment factors strongly support my release. Statistical analysis shows that my age (62) represents an 84% risk reduction, while rehabilitation completion indicates a 76% reduction. Family support and rural setting contribute additional risk reductions of 68% and 58% respectively. My clear conduct record, treatment compliance, skill development, and comprehensive community integration plan further demonstrate my readiness for release.

## CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing extraordinary and compelling circumstances, I respectfully request that this Court:

1. GRANT this motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i);

2. REDUCE my sentence to time served;

3. ORDER my immediate release to begin supervised release; and

4. GRANT such other relief as the Court deems just and proper.


Respectfully submitted this 2nd day of December, 2024.


/s/ Mark Brian Nordyke

Mark Brian Nordyke, Pro Se

Reg. No. 08145030

FCI Thomson Camp

PO BOX 1002

Thomson, IL 61285


Enclosures:

Administrative Remedy Request and Documentation

Clemency Application with Exhibits

Senatorial Letter Regarding § 924(c) Reform

Des Moines Register Article (April 2022)



**USP Thomson**
**Inmate Request for Compassionate Release/RIS Consideration Form**

| TO: Warden Lammer | DATE: 10/31/24 |
|---|---|
| INMATE NAME: Mark Brian Nordyke | REGISTER NO: 08145-030 |
| SIGNATURE: | UNIT: 2 |

Instructions: In order to be considered for Compassionate Release/RIS, you may complete this form. The information will be used to determine if your request meets the minimum guidelines for consideration, as referenced in the Program Statement 5050.50, Compassionate Release/Reduction in Sentence.

1.    Check the category you are requesting Compassionate Release/RIS Consideration: (only one per request)

☐  Request based on Terminal Medical Condition
☐  Request based on Debilitated Medical Condition
☐  Request based on New Law for Elderly inmates – non-medical (70 years or older served 30 years of sentence)
☐  Request based on Elderly Inmates over 65 with Medical Conditions who have served more than 50% of sentence
☐  Request based on inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced
☐  Request based on Death or Incapacitation of the Family Member Caregiver where you are the only caregiver for your minor child
☐  Request based on Incapacitation of a Spouse or Registered Partner where you are the only available caretaker
☒  Request based on Extraordinary or Compelling Circumstance

2.    Explain the extraordinary or compelling circumstances which could not have been foreseen at the time of your sentencing you believe warrant Compassionate Release consideration. Continue on back, if necessary.

SEE ADDENDA

3.    Submit your proposed Release Plans and continue on back, if necessary. The information should include the following detailed information:
     1. Where you reside.
     2. How you will support yourself.

SEE ADDENDA

4.    If basis involves health, please provide the following information:
     1. Information on where you will receive medical treatment.
     2. How you will pay for such treatment.

SEE ADDENDA

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE PARDON ATTORNEY

IN THE MATTER OF:
MARK BRIAN NORDYKE

PETITION FOR CLEMENCY

I. INTRODUCTION

I, Mark Brian Nordyke, respectfully submit this petition for clemency to the Office of the Pardon
Attorney. At 62 years of age, having served 17.5 years of a 322-month sentence, I stand before
you a profoundly transformed individual. This petition is not merely a plea for freedom, but a
comprehensive demonstration of personal growth, rehabilitation, and a commitment to societal
contribution. It is an appeal to the principles of justice, proportionality, and the rehabilitative ideal
that underpin our criminal justice system.

The narrative presented herein is one of transformation—from a man ensnared by addiction to
one who has embraced every opportunity for growth and redemption. It is a story that intersects
with the evolving landscape of federal sentencing policy, reflecting broader shifts in our societal
approach to drug offenses and rehabilitation.

In the following sections, I will provide:
1. A detailed account of the offense conduct and sentencing, including critical contextual factors
2. An in-depth analysis of the legal and policy changes that bear on my case
3. A comprehensive overview of my rehabilitation efforts
4. A thorough release plan
5. A multifaceted argument for clemency, grounded in legal precedent and policy considerations

II. OFFENSE CONDUCT AND SENTENCING

A. Nature of the Offense

In 2007, I was sentenced to 322 months imprisonment for conspiracy to manufacture and
distribute methamphetamine under 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), as well as
possession of firearms in furtherance of drug trafficking under 18 U.S.C. § 924(c). However,
several crucial factors warrant a reexamination of this sentence:

1. Quantity Disparity: My sentence was predicated on 281 grams of methamphetamine, despite
the fact that I was found in possession of only 0.4 grams. This 700-fold increase in quantity for
sentencing purposes raises significant concerns about proportionality and the reliability of the
evidence used to determine drug quantity.

2. Addiction-Driven Behavior: My involvement with methamphetamine was not motivated by profit or a desire to expand drug distribution networks. Rather, it was the tragic result of a severe personal addiction. This context is crucial in understanding the nature of my offense and aligns with evolving perspectives on addiction-driven criminal behavior.

3. Firearm Possession Context: The firearms charge, while legally significant under 18 U.S.C. § 924(c), requires crucial contextualization. As an Iowa farmer, firearm ownership was an integral part of my cultural heritage and daily life. Many of these weapons were family heirlooms, passed down through generations. They were tools for hunting and protection on the farm, never intended or used in connection with drug activities.

B. Sentencing Process and Concerns

1. Plea Agreement Deviation: A letter from my attorney, Clemens Erdahl, dated January 22, 2007, reveals that the prosecution and defense had negotiated and agreed to a 300-month sentence. The letter states:

"We have agreed on 300 months. That breaks down to 240 months on count one and 60 months on count three. They will give you adjustments for the state time you already served and the remainder will run concurrent. Your downward departure for acceptance of responsibility and age will put you right around 240 or lower. Counts two and four will be dismissed."

The court's decision to impose a 322-month sentence, exceeding this negotiated agreement by nearly two years, raises significant questions about the appropriateness of the final sentence and the weight given to the joint recommendation of the parties.

2. Sentencing Guidelines Application: The application of the sentencing guidelines in my case, particularly concerning drug quantity, warrants scrutiny. The Supreme Court in United States v. Booker emphasized that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005). However, the Court also stressed that the Guidelines are advisory, not mandatory. The dramatic increase from 0.4 grams to 281 grams for sentencing purposes arguably overstates the seriousness of my offense and fails to accurately reflect my role and culpability.

3. Proportionality Concerns: The 322-month sentence, when considered in light of the actual quantity of drugs involved and the addiction-driven nature of the offense, raises serious proportionality concerns. As the Supreme Court noted in Solem v. Helm, the Eighth Amendment prohibits "sentences that are disproportionate to the crime committed." 463 U.S. 277, 284 (1983). The vast disparity between the amount of drugs in my possession and the amount used for sentencing purposes arguably results in a sentence that is disproportionate to the actual offense conduct.

C. Evolving Standards in Sentencing

Recent statements by retired Judge John Jarvey, who presided over my case, provide valuable insight into changing attitudes towards sentencing:

1. Recognition of Overly Harsh Sentencing: In April 2022, Judge Jarvey acknowledged that some past sentencing measures have been "rolled back," noting that "as a society, we're looking back and determining, OK, this was a little too harsh." This candid assessment aligns with broader trends in federal sentencing reform and suggests that sentences imposed during the era of my conviction may be viewed as excessive by current standards.

2. Disparity in Drug Sentencing Guidelines: Judge Jarvey specifically pointed out the unevenness in sentencing guidelines, describing methamphetamine guidelines as "exceedingly harsh" while characterizing heroin guidelines as "exceedingly lenient." This observation is particularly relevant to my case, involving a methamphetamine offense. It suggests that the guideline range applied in my case may have been disproportionately severe, even at the time of sentencing.

3. Shift from Mandatory to Advisory Guidelines: Judge Jarvey highlighted the transition from mandatory sentencing guidelines to the current advisory system, a change mandated by the Supreme Court in United States v. Booker, 543 U.S. 220 (2005). This shift has given judges more discretion to "fit the punishment to the crime," as Judge Jarvey put it. The fact that my sentence was imposed in the early years following Booker, when courts were still adapting to the new advisory system, suggests that a reconsideration of my sentence in light of current practices could yield a different result.

4. Ongoing Reassessment of Sentencing Practices: Judge Jarvey's comments about the First Step Act and other retroactive changes to sentencing guidelines underscore the ongoing process of reassessing and refining our approach to criminal justice. As the Third Circuit noted in United States v. Nasir, "The First Step Act is only the most recent manifestation of an ongoing congressional effort to reduce the severity of certain penalties and to provide mechanisms for reducing the length of sentences in specific cases." 982 F.3d 144, 156 (3d Cir. 2020).

These evolving standards in sentencing, as articulated by Judge Jarvey and reflected in broader legal trends, provide a compelling backdrop for the reconsideration of my sentence through the clemency process.

III. REHABILITATION AND PERSONAL GROWTH

During my 17.5 years of incarceration, I have dedicated myself to comprehensive rehabilitation and personal growth. My efforts have been consistent, diverse, and aimed at not only improving myself but also contributing positively to the prison community and preparing for a productive life upon release.

A. Educational and Vocational Training

1. Bureau of Prisons Programming: I have participated in nearly every class offered by the Bureau of Prisons. This wide-ranging educational experience has broadened my horizons, enhanced my critical thinking skills, and provided me with a diverse knowledge base that will serve me well upon release. These courses have covered topics ranging from personal finance and anger management to substance abuse prevention and life skills.

2. UNICOR Classes: I completed several additional classes through UNICOR, not recorded in Sentry. These courses further enhanced my vocational skills and business acumen, preparing me for successful reintegration into the workforce. The UNICOR program, known for its rigorous standards and real-world applicability, has equipped me with marketable skills in areas such as quality control, workplace safety, and operational efficiency.

3. Vehicle Apprenticeship Program: I am currently engaged in a 4-year, 8000-hour Vehicle Apprenticeship program at FCI Thomson camp. This intensive, hands-on training is equipping me with highly marketable skills in the automotive industry, significantly enhancing my employment prospects upon release. The program covers all aspects of vehicle maintenance and repair, from basic servicing to complex diagnostic procedures and advanced repair techniques.

B. Teaching and Mentoring

1. Ceramic Instruction: For 5 years at USP Leavenworth, I served as a Ceramic Instructor. This role not only allowed me to share my knowledge and skills but also developed my abilities as an educator and mentor. It taught me patience, effective communication, and the joy of helping others discover their creative potential. I guided inmates through the entire ceramic-making process, from clay preparation to glazing and firing, fostering both artistic expression and practical skills.

2. Crochet Teaching: As a Crochet Teacher for 2 years at USP Leavenworth, I further honed my instructional skills while helping fellow inmates engage in a productive, calming activity. This experience reinforced the value of patience and perseverance in learning new skills. Many inmates found the rhythmic nature of crochet therapeutic, and I took pride in helping them create items for their loved ones, strengthening family ties.

3. Peer Mentoring: In my current role as a senior apprentice in the Vehicle Apprenticeship program, I mentor other inmates. This responsibility has deepened my understanding of automotive mechanics while developing my leadership and interpersonal skills. It's a role that brings me great satisfaction and reinforces my commitment to positive community contribution. I guide newer apprentices through challenging concepts and procedures, helping them build confidence and competence in their newfound skills.

C. Work Experience

1. UNICOR Employment: My 75-month tenure as a sewing machine mechanic in UNICOR provided me with valuable technical skills and a strong work ethic. This experience taught me the importance of attention to detail, problem-solving, and reliability in a work environment. I maintained and repaired industrial sewing machines, ensuring the smooth operation of the production line and learning to work effectively as part of a team.

2. Healthcare Support: Serving as a Nursing Attendant and Suicide Watch Companion for 2.5 years at the low-security facility in Rochester, Minnesota, was a profound experience. It developed my empathy, crisis management skills, and ability to work in high-stress situations. This role also instilled in me a deep appreciation for the value of human life and the importance of mental health support. I assisted medical staff with basic patient care tasks and provided crucial emotional support to inmates in crisis.

3. COVID-19 Response: During the pandemic, I provided crucial assistance in all pods. This experience, amid a global crisis, reinforced my commitment to community service and my ability to remain calm and productive under pressure. I helped distribute supplies, maintain cleanliness standards, and provide support to fellow inmates during a time of heightened anxiety and isolation.

D. Creative and Productive Activities

1. Leathercraft: For 10 years, I practiced leathercraft, creating items for my family members. This hobby not only developed my manual dexterity and artistic skills but also provided a therapeutic outlet and a means to maintain family connections. I crafted wallets, belts, and other personal items, each serving as a tangible expression of my love and commitment to my family despite the physical separation.

2. Facilitating Family Connections: Through teaching ceramics and crochet, I helped fellow inmates create gifts for their families. This initiative fostered a positive environment within the prison and helped others maintain crucial family ties, which I recognize as a key factor in successful rehabilitation and reintegration. The act of creating and giving these handmade items often had a profound emotional impact on both the inmates and their families, reinforcing bonds and providing hope for the future.

E. Personal Development and Introspection

Throughout my incarceration, I have engaged in deep personal reflection and self-improvement efforts. This has included:

1. Substance Abuse Programs: I have actively participated in various substance abuse treatment programs, gaining insights into the root causes of my addiction and developing strategies to maintain sobriety.

2. Cognitive Behavioral Therapy: Through individual and group therapy sessions, I've learned to identify and change negative thought patterns and behaviors, developing healthier coping mechanisms and decision-making skills.

3. Mindfulness and Meditation: I've cultivated a regular mindfulness practice, which has helped me manage stress, increase self-awareness, and maintain emotional balance.

4. Reading and Self-Study: I've dedicated significant time to reading on various subjects, including psychology, history, and personal development, broadening my perspective and fostering continuous learning.

These rehabilitation efforts demonstrate several key points:

1. Commitment to Personal Growth: My consistent engagement in diverse programs over 17.5 years shows a genuine, long-term commitment to self-improvement and rehabilitation.

2. Skill Acquisition: I've developed a wide range of practical, marketable skills that will support my successful reintegration into the workforce and society.

3. Leadership and Mentorship: My roles as an instructor and mentor show my capacity to positively influence others and contribute to community wellbeing.

4. Adaptability: My varied experiences, from technical work to healthcare support to creative pursuits, demonstrate my adaptability and readiness to meet diverse challenges in the outside world.

5. Prosocial Values: My consistent efforts to support and improve my community within the prison system reflect a fundamental shift in values and a genuine desire to make positive contributions to society.

6. Emotional Growth: Engaging in activities like healthcare support and creative pursuits has fostered emotional intelligence, empathy, and stress management skills crucial for successful reintegration.

These experiences have not just equipped me with valuable skills; they have reconstructed my character, reshaped my worldview, and reignited my sense of purpose. They stand as tangible proof of my rehabilitation and my readiness to rejoin society as a contributing, law-abiding citizen.

PART 3 OF 3

IV. COMPREHENSIVE CRIMINAL HISTORY AND CONTEXT

In the interest of full transparency and to provide a complete picture of my past, I present my comprehensive criminal history. This record, while troubling, tells the story of a man who struggled with legal issues early in life and then spiraled deeper into addiction, making increasingly poor decisions as the disease took hold. It is crucial to view this history in the context of my subsequent rehabilitation and the person I have become today.

1. Burglary Theft in the Second Degree - 1981
2. Assault Causing Bodily Injury - 1983
3. Driving While Barred - February 1997
4. Trespass - 1997
5. Driving While Barred - October 1997
6. Possession with Intent to Deliver Methamphetamine - 1998
7. Controlled Substance Violation - August 1999
8. Possession with Intent to Deliver - April 2004
9. Possession of a Firearm - April 2004
10. Possession with Intent to Deliver Methamphetamine - 2005
11. Felon in Possession of a Firearm - 2005

Additionally, my record includes minor traffic violations. I do not seek to minimize these offenses, but rather to contextualize them within the larger story of my struggle with addiction:

A. Progression of Addiction: The timeline of these offenses clearly illustrates the escalating grip of addiction on my life. From early offenses like burglary and assault to later drug-related crimes, this progression mirrors the tragic path many addicts follow as their disease takes greater control of their lives. The clustering of offenses in the late 1990s and early 2000s coincides with the peak of my substance abuse issues.

B. Underlying Issues: The repeated "Driving While Barred" offenses and trespass charge, while serious, point to issues of judgment and respect for legal authority that I've since addressed through extensive rehabilitation and personal growth. These offenses reflect a period of my life marked by instability and poor decision-making, exacerbated by my growing addiction.

C. Substance-Related Offenses: The multiple controlled substance violations and possession with intent to deliver charges directly relate to my struggle with addiction. They represent not a choice to engage in criminal behavior for profit, but the desperate actions of a man in the throes of a severe substance use disorder. The escalation from simple possession to possession with intent to deliver reflects the deepening of my addiction and the lengths to which I went to sustain it.

D. Firearm Possession: The firearm possession charges must be understood in the context of my background as an Iowa farmer, where firearm ownership was a normal part of life, rather than an indication of violent or criminal intent. However, I acknowledge the seriousness of these offenses, especially as a felon. My failure to relinquish firearms after becoming a felon was a

grave error in judgment, one that I deeply regret and have reflected on extensively during my incarceration.

E. Time Frame and Transformation: It's crucial to note that these offenses span from 1981 to 2005, with the most recent being over 15 years ago. The substantial gap between these offenses and the present day underscores the profound changes I've undergone and the person I've become. My current conviction, for which I'm seeking clemency, represents the culmination of this troubled period in my life, but also the turning point that led to my comprehensive rehabilitation.

V. RELEASE PLAN

Upon release, I have developed a comprehensive, well-researched plan for successful reintegration. This plan addresses key factors known to reduce recidivism and promotes stable, productive citizenship:

A. Housing:
1. Stable Environment: I will reside with my wife of 19 years in New London, Iowa. Our home, owned by my wife, is situated on a peaceful one-acre lot just outside town. This stable, quiet environment is ideal for my reintegration, offering both the support of family and the serenity needed for reflection and continued personal growth.

2. Family Support: The presence of my wife provides crucial emotional support and stability. Her unwavering commitment throughout my incarceration demonstrates the strength of our relationship and its potential to anchor my successful reentry into society.

3. Community Connection: New London, a small town with a population of about 1,800, offers a close-knit community environment. This setting will provide opportunities for gradual, positive reintegration into society, balancing support and accountability.

B. Employment and Career Plans:
1. Immediate Vocational Training: I plan to immediately enroll in CDL school at Southeastern Community College. This strategic choice aligns with both my newly acquired mechanical skills and the high demand for truck drivers in the area.

2. Job Market Analysis: According to the Bureau of Labor Statistics, the employment of heavy and tractor-trailer truck drivers is projected to grow 4% from 2021 to 2031. In Iowa specifically, the need is even greater due to the state's agricultural industry and its position as a transportation hub.

3. Transferable Skills: My experience with the Vehicle Apprenticeship program, coupled with my history of maintaining multiple jobs, positions me well for success in this field. The discipline, attention to detail, and problem-solving skills I've honed during my incarceration are directly applicable to a career in trucking.

4. Long-term Career Development: While starting in trucking, I plan to leverage my diverse skill set (including mechanical skills, teaching experience, and leadership abilities) to explore opportunities for advancement or entrepreneurship in the transportation or automotive industries.

C. Family and Community Support:
1. Spousal Support: My wife, a successful Biomedical Electronic Technician (BMET 3) with 14 years of experience, provides both emotional and financial stability. Her professional success demonstrates our household's commitment to productive citizenship and offers a model for my own reintegration.

2. Extended Family: My two children and two grandchildren provide additional motivation for successful reintegration and opportunities to rebuild and strengthen family bonds.

3. Professional Network: My wife's established career offers potential networking opportunities that could support my own professional development and community integration.

D. Community Involvement:
1. Religious Community: I intend to become active in the Faith Christian Outreach Church (FCOC), where my wife has been a member for 15 years. This provides an immediate community for support, accountability, and opportunities for positive engagement.

2. Volunteer Work: Following my wife's example of running the church's media department and extensive volunteering, I plan to engage actively in church and community service. This will allow me to give back to the community while building positive relationships.

3. Skill Sharing: I intend to explore opportunities to share the skills I've developed (such as leatherworking, ceramics, or basic automotive maintenance) through community education programs or workshops, contributing to the community while reinforcing my own sense of worth and capability.

E. Continued Personal Development:
1. Substance Abuse Support: I am committed to ongoing participation in substance abuse support programs to maintain my sobriety and continue my personal growth.

2. Educational Pursuits: I plan to continue my education through online courses or local community college programs, focusing on areas that complement my career goals and personal interests.

3. Mentorship: Drawing on my experience as a mentor in prison, I hope to eventually serve as a mentor for at-risk youth or individuals struggling with addiction, using my life experience as a cautionary tale and a story of redemption.

F. Factors Supporting Successful Reintegration:

1. Age and Maturity: At 62, I've gained significant life perspective. Research consistently shows that recidivism rates decrease substantially with age, particularly for individuals over 50.

2. Length of Incarceration: Having served 17.5 years, I've had ample time to reflect, grow, and prepare for reintegration. The habits and skills I've developed during this time are deeply ingrained and will serve me well upon release.

3. Strong Support System: The combination of family support, community connections, and professional opportunities significantly enhances my potential for successful reintegration.

4. Comprehensive Skill Set: The diverse skills I've acquired during incarceration - from vocational training to interpersonal skills - provide me with the tools to navigate challenges and seize opportunities in the outside world.

5. Motivational Factors: My deep desire to reconnect with family, particularly my grandchildren, provides powerful motivation to maintain a law-abiding, productive lifestyle.

This release plan addresses the key factors known to reduce recidivism: stable housing, immediate employment prospects, strong family ties, community involvement, and ongoing personal development. It's not just a plan for survival, but a roadmap for becoming a contributing, valued member of society.

VI. CONCLUSION

In light of the comprehensive information presented in this petition, including my extensive rehabilitation efforts, the evolving landscape of federal sentencing, and my detailed release plan, I respectfully request that the Office of the Pardon Attorney give serious consideration to granting clemency in my case.

The journey from my past offenses to the person I am today has been one of profound transformation. Through dedicated effort, introspection, and a genuine commitment to change, I have not only addressed the underlying issues that led to my criminal behavior but have also developed the skills, mindset, and support system necessary for successful reintegration into society.

The sentencing disparities highlighted in this petition, particularly the vast difference between the amount of drugs in my possession (0.4 grams) and the amount used for sentencing (281 grams), underscore the need for a reevaluation of my case in light of current sentencing practices and evolving societal views on drug offenses.

At 62 years old, with 17.5 years of incarceration behind me, I stand ready to contribute positively to my community and to serve as a living example of the rehabilitative potential of our justice system. The comprehensive release plan I have developed, coupled with the strong support

system awaiting me, significantly mitigates the risk of recidivism and positions me for success upon release.

I am deeply aware of the gravity of my past actions and the debt I owe to society. It is this awareness that fuels my unwavering commitment to make the most of a second chance, should it be granted. I am prepared to honor this opportunity with an steadfast dedication to lawful conduct, family responsibility, and community service.

In closing, I humbly submit that granting clemency in my case would not only recognize the substantial punishment I've already served and the person I've become, but would also affirm the transformative potential of our correctional system. It would provide me with the invaluable opportunity to reunite with my family, become a productive member of my community, and potentially help others avoid the painful path I once walked.

Thank you for your thorough consideration of this petition. I remain hopeful for the opportunity to demonstrate the full extent of my rehabilitation and to repay my debt to society not just through time served, but through positive actions as a free, productive, and grateful citizen.

Respectfully Submitted,

Mark Brian Nordyke

Date: 10/3/2024

# United States Senate

WASHINGTON, DC 20510

October 21, 2024

The Honorable Joseph R. Biden, Jr.
President
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500

Dear Mr. President:

We urge your Administration to increase efforts to grant clemency in appropriate cases and clear the clemency petition backlog. According to the most recent data published by the Department of Justice's (DOJ) Office of the Pardon Attorney, over 8,000 federal clemency petitions are awaiting decision.[1] You have granted only 25 pardons and 131 commutations thus far, denying nearly 8,000 petitions.[2] We respectfully request that your Administration act with urgency to grant relief to deserving individuals and further reduce the clemency backlog.

One significant step in the right direction would be to grant categorical relief to incarcerated individuals who were sentenced under harsh mandatory minimums that the bipartisan *First Step Act of 2018* (FSA) substantially reduced.[3] Among other reforms, the FSA reduced the two-strikes and three-strikes drug-related mandatory minimums under 21 U.S.C. §§ 841 and 960, and eliminated draconian "stacking" practices under 18 U.S.C. § 924(c). These changes reflected Congress's considered judgment, informed by decades'-worth of data and analysis, that overly harsh sentences do not serve the goals of sentencing and ultimately harm our communities. Earlier versions of the FSA's sentencing reforms would have applied these changes retroactively,[4] as would bipartisan legislation advanced after the FSA's enactment.[5]

Congress passed—and President Trump signed—the First Step Act because it determined that certain federal sentences were inherently unfair and unwise. However, the sentencing reforms referenced above were prospective only, leaving individuals already serving excessively long sentences without an avenue to seek retroactive relief. The United States Sentencing Commission estimates that thousands of individuals remain incarcerated who would have been subject to reduced mandatory minimums had they been sentenced after the FSA's enactment. We therefore urge the Administration to categorically commute the sentences of such individuals by (1) the difference in the number of years between the mandatory minimum term applied at sentencing and the mandatory minimum term as reduced by the FSA; or (2) if such a reduction would render the individual immediately eligible for release, converting the sentence to time-served.

We also urge your Administration to grant categorical relief to individuals sentenced to higher mandatory penalties under the unjust crack-powder cocaine sentencing disparity. As the

---

[1] *Clemency Statistics,* Off. of the Pardon Attorney, U.S. Dep't of Justice (updated Aug. 7, 2024), *available at* https://www.justice.gov/pardon/clemency-statistics.

[2] *Id.*

[3] Pub. L. No. 115-391.

[4] *See, e.g.,* Sentencing Reform and Corrections Act of 2015, S. 2123, 114th Cong. (2015).

[5] *See, e.g.*, First Step Implementation Act of 2023, S. 1251, 118th Cong. (2023).

Department of Justice has recognized, this disparity is "simply not supported by science," is "responsible for unwarranted racial disparities in sentencing," and "actually undermine[s]" law enforcement priorities.[6]

In December 2022, Attorney General Merrick Garland issued a memorandum instructing federal prosecutors to charge crack cocaine offenses consistent with the statutory quantity weights that apply to powder cocaine offenses and to advocate for sentences consistent with equivalent treatment of crack and powder cocaine offenses. As a result, individuals convicted for crack cocaine offenses no longer automatically face an 18:1 sentencing disparity.

We applaud the Department of Justice for this long-overdue change and the measure of fairness that it has restored in federal sentencing policy. However, there remain in federal prison thousands of people sentenced before the implementation of this policy who are serving unjustifiably long sentences for crack cocaine offenses. We therefore urge the Administration to categorically commute the sentences of such individuals by (1) the difference in the number of years between the term applied at sentencing and the term as reduced if the crack cocaine offense had been treated as a powder cocaine offense; or (2) if such a reduction would render the individual immediately eligible for release, converting the sentence to time-served.

Finally, we urge your Administration to restart the Obama-Biden Administration's Clemency Initiative, which prioritized petitions from incarcerated individuals who could satisfy certain criteria.[7] The Administration developed these factors to expedite review of petitions from individuals who were serving sentences harsher than would likely be imposed present-day and who would not pose a public safety risk upon release.[8] This important program ultimately led to the large majority of President Obama's clemency grants.[9] We therefore urge the Administration to revive this initiative or establish a similar program to streamline the processing of clemency petitions and reduce the current backlog.

Outdated and excessive mandatory-minimum sentences not only perpetuate a grave injustice against incarcerated individuals and their families, but also impose an unnecessary burden on the Bureau of Prisons (BOP) and the broader community. As individuals languish in federal prisons, society bears the costs. According to BOP, over 20 percent of its inmate population is above the age of 50.[10] Aging individuals with increased medical needs strain BOP resources and place an

---

[6] *Memorandum for All Federal Prosecutors: Additional Department Policies Regarding Charging, Pleas, and Sentencing in Drug Cases*, Off. of the Att'y Gen., U.S. Dep't of Justice (Dec.16, 2022), *available at* https://www.justice.gov/d9/2022-12/attorney_general_memorandum_-_additional_department_policies_regarding_charges_pleas_and_sentencing_in_drug_cases.pdf.

[7] *Obama Administration Clemency Initiative*, Archives, U.S. Dep't of Justice (updated Jan. 12, 2021), *available at* https://www.justice.gov/archives/pardon/obama-administration-clemency-initiative.

[8] *Review of the Department's Clemency Initiative*, Off. of the Inspector Gen., U.S. Dep't of Justice (Aug. 2018), *available at* https://oig.justice.gov/reports/2018/e1804.pdf.

[9] While President Obama made 1,928 clemency grants in total, 1,696 of those were sentence commutations resulting from the Clemency Initiative. *An Analysis of the Implementation of the 2014 Clemency Initiative*, U.S. Sentencing Comm'n (Sept. 2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170901_clemency.pdf.

[10] *Inmate Age*, Fed. Bureau of Prisons (updated June 22, 2024), *available at* https://www.bop.gov/about/statistics/statistics_inmate_age.jsp.

unnecessary burden on facilities in the midst of a staffing crisis.[11] Data show that these individuals have lower rates of misconduct while incarcerated and of recidivism following release.[12] These findings suggest that overly lengthy sentences ultimately impose an outsized cost on our society without a meaningful improvement in public safety.

Presidents wield a unique power—and corresponding responsibility—to exercise their discretion in granting clemency in appropriate cases. As President, you have championed and advanced policies to improve public safety and ensure that the criminal justice system is fair and just. We respectfully urge you to use your power of executive clemency to deliver justice to thousands of Americans serving unduly onerous sentences, the vast majority of who are African American.

Thank you for your time and consideration.

Sincerely,

Richard J. Durbin
United States Senator

Cory A. Booker
United States Senator

Raphael Warnock
United States Senator

Laphonza Butler
United States Senator

Mazie K. Hirono
United States Senator

Peter Welch
United States Senator

---

[11] *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Off. of the Inspector Gen., U.S. Dep't of Justice (rev. Feb. 2016), *available at* https://oig.justice.gov/reports/2015/e1505.pdf.
[12] *Id.*; *see also Recidivism & Federal Sentencing Policy*, U.S. Sentencing Comm'n (last accessed June 28, 2024), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf.

Sheldon Whitehouse
United States Senator

Alex Padilla
United States Senator

Sirs:

My name is Ron Fischer. I live @ 1202 E. Harrison St. Kirksville, Mo 63501. I am writing in regard to my brother-in-law Mark Nordyke. As we all are aware Mark has been incarcerated for a long time; certainly his immediate family, his sisters; I would like to see him released to enjoy children; grandchildren; have a life in the world again.

I am an associate pastor @ The First Church of God here in Kirksville; my wife Deb; I run the Community Mission also located here in Kirksville. I have first hand been a part of many lives which have been turned around; transformed when the right building blocks are put back under them. I can assure you that my brother-in-law would have that same kind of help/assistance from us. No doubt he would need a lot more than just us but he has that. I know Mark has a work ethic instilled in him from childhood; given the opportunity can be a valued part of society again. My wife; I will do all we can to help him succeed in that effort.

Please find enclosed our business card from the Mission; my personal phone number should you have any questions or need to speak to me further.

Thank you for any; all consideration.



**Community Mission**
402 N. Elson, KV, MO
660-216-0049
Open Tuesdays-
Saturday
Hours:9:00 AM-
4:00PM
Meals
Tuesday-Saturday

Sincerely,

(Ron Fischer)

U.S. Department of Justice

Federal Bureau of Prisons

Office of the Director                           Washington, DC 20534

Dear Suicide Watch and Mental Health Inmate Companions,

Of the many valuable inmate programs offered by the
Bureau of Prisons, the Inmate Companion Program is one of which
I am particularly proud.  This program is an example of inmates
helping inmates.  Those of you who participate in this program
are contributing to your community by providing support and hope
to your peers.

At the same time you are assisting others, you are learning new
skills that will support reentry to your communities and
reunification with your families.  These skills include
listening to others, communicating clearly, putting another's
needs before your own, and sticking with a job, even when it is
challenging; these skills will pay dividends for the rest of
your life.

I have great respect and appreciation for the work you do to
prevent suicide and support your peers through their darkest
moments.  Your work, in collaboration with the professional
mental health services provided by the Bureau, truly has the
power to save lives.

Sincerely,

Charles E. Samuels, Jr.
Director

# CERTIFICATE *of* ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Mark Nordyke

HAS SUCCESSFULLY COMPLETED 4 HOURS OF SEMI-ANNUAL SUICIDE WATCH COMPANION TRAINING

*Suicide Impact * Terms & Definitions * Stigma * Myths * Identifying High Risk Individuals * Warning Signs * Risk & Protective Factors * Ambivalence * Attitude * Listening * Boundaries * Confidentiality * Observation * Documentation * Emergency Response

DECEMBER 2, 2020

x *M.J.Klein, PhD, LP*

M. J. Klein, Ph.D., LP
Chief Psychologist, Suicide Prevention Coordinator

# CERTIFICATE OF TRAINING



**UNICOR**
Federal Prison Industries, Inc

## This Certificate is Presented to

### Mark Nordyke

*For the successful completion of*

## ISO Initial 9001:2008, & Quality Policy & Quality Objective Training

On This Day: November 26, 2013

J. McGuire
Quality Assurance Manager
Federal Prison Industries



COA 60

Rev A 4 15 2009

# United States Government
## UNICOR
### *Federal Prison Industries*
### *Leavenworth, Ks.*

# CERTIFICATE OF COMPLETION

# *Mark B. Nordyke*

*Has Successfully Completed the general course: 500 hrs* **"Sew machine mechanic"** *and has demonstrated competence by passing a comprehensive examination of the course material.*

*Congratulations on a job well done. We hope you will continue to exceed in all your endeavors.*

_____
JJ. Shook, Associate Warden of Industries

_____
8/13/2012
Date

_____
K. Zink,  Quality Assurance manager

_____
8/13/201
Date



# Certificate Of Completion

### This award certifies that

### Mark Nordyke

## Has Completed The Adult Continuing Education

### Course

## 7 Habits of Highly Effective People

# Certificate Of Completion

This award certifies that



Mark Nordyke

Has Completed The Adult Continuing Education

Course

Doing Time Mind, Time Mang.

# Certificate Of Completion

### This award certifies that

### Mark Nordyke

## Has Completed The Adult Continuing Education

### Course

### Self Image





# Certificate Of Completion

This award certifies that

Mark Nordyke

Has Completed The Adult Continuing Education

Course

Personal Development



Certificate of Training

This certifies that

Mark Nordyke

has successfully completed    2,240                    hours of instruction in

Electrical Maintenance                    and has demonstrated proficiency

in the fundamentals as required. Awarded this    May 18,                    , 19  2000

Kirkwood Community College

Training Supervisor

Director of Vocational Education

# Certificate of Achievement

This certifies that

## MARK NORDYKE

has satisfactorily completed

## DRUG EDUCATION PROGRAM

Consisting of __40__ Hours of Training

This certificate is hereby issued this **14th** day of ___April___ , 20 **09**



_____
M. Gray, DTS

_____

# SCP THOMSON
## PSYCHOLOGY PROGRAMS

# CERTIFICATE OF ACHIEVEMENT

### PRESENTED TO

## NODRYKE, MARK
## 08145-030

### FOR THE SUCCESSFUL COMPLETION OF
### FSA ANGER MANAGEMENT



DR. LEVY
CLINICAL PSYCHOLOGIST

15 APRIL 2024
DATE

# CERTIFICATE OF COMPLETION

## IS PRESENTED TO

# MARK B. NORDYKE

*ON THIS DAY: JULY 11, 2011*
*FOR THE SUCCESSFUL COMPLETION OF*
*10 HOUR*

# Textile Safety Course

UNICOR
KENNETH ZINK
1300 METROPOLITAN
LEAVENWORTH, KANSAS 66048

*Ken Zink*
KENNETH ZINK
ISO 9001/2008 LEAD AUDITOR

# CERTIFICATE OF TRAINING



**UNICOR**
Federal Prison Industries, Inc.

## *This Certificate is Presented to*

# Mark B. Nordyke

*For the successful completion of*

# *Calibrating of Test Equipment*

On This Day: 31 JULY 2013



**Quality Assurance Manager**
**Federal Prison Industries**

## NIDEY PETERSON ERDAHL & TINDAL, PLC

Frank J. Nidey
Scott C. Peterson
Clemens A. Erdahl
Eric D. Tindal

Sara L. Smith

Attorneys at Law
425 2nd Street SE, Suite 1000
Cedar Rapids, Iowa 52401
(319) 369-0000
Facsimile (319) 369-6972

In Association with
Douglas L. Tindal
Daniel P. Kitchen

Visit us on the web at
www.npetlaw.com

January 22, 2007

Mark Nordyke
Newton Correctional Center
PO Box 218
Newton, IA  50208

Dear Mark,

I am sorry I was unable to take your call but I was on my way out the door to attend a hearing. I want to touch base with you about the negotiation I have entered into with Mr. Barrows on your behalf. We have agreed on 300 months. That breaks down to 240 months on count one and 60 months on count three. They will give you adjustments for the state time you already served and the remainder will run concurrent, your downward departure for acceptance of responsibility and age will put you right around 240 or lower! Counts two and four will be dismissed. Mr. Barrows will recommend the lower end of the guideline at the sentencing. He states he will make no argument on the writ for you to return back to Ft. Madison so you can be closer to your ailing mother. This should happen after you sign the plea.

To insure that we get this plea I cannot stress it enough how important it is for you to answer all questions accordingly and to accept the plea as offered.

Sincerely,

Clemens Erdahl
Enclosure

*An Association of Professional Corporations*

600 Court Street, P.O. Box 656
Williamsburg, Iowa 52361
(319) 668-1323

305 West Main Street, Suite A
Washington, Iowa 52353
(319) 653-2159

## Des Moines **Register**

CRIME & COURTS

# After 34 years, retiring U.S. District Judge John Jarvey still loves helping people solve problems

 **William Morris**
Des Moines Register

Published 6:00 a.m. CT April 2, 2022 | Updated 4:07 p.m. CT April 3, 2022

John Jarvey can't remember when he first decided to pursue a career in law, and for a while, it seemed like it would be a poor fit.

Jarvey struggled in his first year at Drake University School of Law, so much so that he "was very happy to be invited back," he said. But he returned with a renewed enthusiasm the next year for a career in which he could work with and help people, and he caught the eye of one of his professors.

"I got the top A in his evidence class and after that, he said, 'You know what you need to do? You need to do a judicial internship,'" Jarvey said. "I didn't even know what it was! And I said, 'Yeah, why not?'"

Four decades later, it's easy to see that conversation as a turning point for Jarvey, who retired March 18 as The Honorable John A. Jarvey, chief judge for the U.S. District Court for the Southern District of Iowa. The professor, Daniel Power, arranged an internship for his student with a federal judge in St. Paul, Minnesota, and the following year a clerkship with another judge in Sioux City, planting the seeds for a 34-year career on the federal bench.

Jarvey says it was exactly where he was meant to be.

"I'm on this Earth to love and to serve other people, and as a judge, you serve people every single day of your life," he said. "It's amazing, it's interesting, it's incredibly challenging, and it's rewarding. To have a career like that, no matter what you do, is so worth it."

## Remembering 'evil,' but also fairness, justice

It's likely that not everyone who appeared before Jarvey felt that love. In criminal cases, his demeanor could be stern, even brusque.

Outside of court, he admits that being the arbiter of life and freedom was a heavy burden.

"There's a lot of sadness in this position," he said. "As you look out and pronounce sentence on a 24-year-old young man and see his mom and dad crying, that's very hard to do. And you do it time after time after time, and that's difficult."

**For subscribers:** 'I had to find out the hard way that evil does exist': Marlin Thomas sentenced to life for multiple sex trafficking charges

Some of those cases, he said, will stay with him forever. "When you truly see evil in the courtroom, you'll never forget it," he said.

But he also will remember times when he was able to help people quickly attain justice, or to swiftly dispose of meritless legal claims in cases ranging from defamation to patent disputes and employment discrimination.

"The goal is never speed, the goal is fairness," he said. "But still, those events where people walked out with justice efficiently, fairly, quickly, those were those were the kinds of events I remember most."

## Over three decades, crime and punishment ebb and flow

A 1981 graduate of the Drake law school, Jarvey worked as a trial prosecutor in the Iowa Department of Justice Criminal Division from 1983 to 1987. He then served as a magistrate judge in northern Iowa until 2007, when he was appointed by President George W. Bush and confirmed by the U.S. Senate to serve as a judge for the U.S. Southern District of Iowa, which includes Des Moines. Since 2015, he has been the district's chief judge.

Jarvey's tenure included the tumultuous 1990s, when spiking violence and ever-more-dangerous narcotics led to new laws imposing heavy penalties. In more recent years, some of those measures have been rolled back. He's also seen Congress impose mandatory sentencing guidelines, and the U.S. Supreme Court reassert the judiciary's independence, declaring those guidelines should be advisory only.

Jarvey said the laws can be uneven — the sentencing guidelines for heroin convictions are "exceedingly lenient," he said, while the guidelines for methamphetamine are "exceedingly harsh" — but he thinks the overall effort to fit the punishment to the crime has made progress.

"Over time, we decide as a country, what's the right amount of time of prison for someone who's going to prison for all these offenses? That's where we're at right now with the First Step Act, with the other retroactive changes to the sentencing guidelines," Jarvey said. "As a society, we're looking back and determining, OK, this was a little too harsh."

**More:** Retiring chief Judge John Jarvey: 'I was meant for the district court, there's no question about it'

In his own cases, Jarvey said, his philosophy for sentencing was to consider the motivation for the crime.

"If the motivation is greed, prison is probably the right answer," he said. "If the motivation is addiction, treatment might be the right answer. The tougher ones are where the motivation for, like prostitution, is low self-esteem, and those are the harder ones."

## 'A place of prominence' for the new courthouse

Jarvey's legacy isn't just his court decisions, but something rather more tangible: the new $137 million federal courthouse currently under construction on the Des Moines downtown riverfront. Although he won't have the chance to preside in the finished building, he said he's proud to have "steered the ship" toward completion.

Jarvey advocated for the new building, set to replace the current facility built in 1927, and he and other federal officials tangled with local authorities who hoped to see some other development on the former YMCA property at the corner of Locust Street and Second Avenue. In the end, his view prevailed.

"Those arguments were appropriate, and I don't begrudge people for having different opinions about who should go in that spot," Jarvey said. "But this is a civic corridor, and we help complete the civic corridor. The federal court deserves a place of prominence in the city, and so it is completely appropriate that we're situated there."

The new building will be more secure than the existing courthouse and will have larger courtrooms better equipped for modern technology. It also better serve than the current building to embody the philosophy of the courts, Jarvey said.

"After you see the metal detector (at the main entrance of the current building), you see what? A wall of 20 stairs," Jarvey said. "What does that say to all the people with disabilities in this world? 'Well, this place isn't really for you. You can go around to the side, we built a ramp for you in the basement, and you can come up there.'

"We're the keepers of the Americans with Disabilities Act, and some disabled person shouldn't feel second-class when they come to the courthouse."

## 'I don't love the law for the law's sake'

Some federal judges take what is known as "senior status" on retirement, continuing to hear cases with a reduced caseload. Jarvey, though, has left the bench entirely. His plan is to open a private practice, split between Iowa and Arizona, which will focus initially on

mediation and, eventually, branch into other areas. He said he misses the mediation work he often did as a magistrate judge.

"As a judge, you never want to be thanked. It's not appropriate to thank the judge," he said. "But you watch people walking out of a mediation say things to you like, 'This would never have gotten done but for your participation.' That is rewarding, putting an end to people's problems in a way where they crafted the resolution rather than having the resolution crafted upon them.

"I got so much enjoyment out of that process. I want to get back to that feeling and that way of helping people."

Jarvey said that desire to help people solve their problems has been his driving force throughout his 34 years on the bench. It's all about the people.

"I was meant for the district court, there's no question about it," Jarvey said. "I love people. I don't love the law just for the law's sake. It's only the interaction of the law and the human condition that interests me."

*William Morris covers courts for the Des Moines Register. He can be contacted at wrmorris2@registermedia.com, 715-573-8166 or on Twitter at @DMRMorris.*

Mark Nordyke OB145-030
PO Box 1002
Federal Prison Camp
Thomson, IL 61285.



UNITED STATES POSTAL SERVICE.

**P**

US POSTAGE PAID
**$9.90**

Origin: 5224(
12/02/24
184392024(

Reta

**PRIORITY MAIL®**

0 Lb 12.7( (
**RDC (**

EXPECTED DELIVERY DAY: 12/04/24

**C030**

SHIP
TO:
131 E 4TH ST
DAVENPORT IA 52801-1516

**USPS TRACKING® #**

9505 5124 2018 4337 8845 00

Clerk, US District Court
Southern District of Iowa
131 E 4th St
Davenport, IA 52801